IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **JEFFREY M. GADKE**, | : | Case No. 1:12-CV-02875 |
| Plaintiff, | : | |
| vs. | : | |
| **COMMISSIONER OF SOCIAL SECURITY** | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

## I. INTRODUCTION.

Pursuant to 72.2(b)(1) of the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES, this case was automatically referred to the undersigned Magistrate Judge for a report and recommendation.  Plaintiff seeks judicial review of Defendant's final determination denying his claim for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act).  Pending are the Briefs of the parties and Plaintiff's Reply (Docket Nos. 13, 14 & 15).  For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On September 14, 2005 and April 8, 2008, Plaintiff filed applications for DIB and SSI,

alleging that he became unable to work because of his disabling condition which began on June 6, 2005 (Docket No. 11, pp. 164-165; 169-172; 173-175; 176-178 of 764).   All applications were denied initially and upon reconsideration (Docket No. 11, pp. 117-119; 123-125; 132-134; 135-137; 138-141; 142-144; 147-148; 149-151 of 764).

Plaintiff filed a timely request for hearing and on December 3, 2010, Plaintiff, represented by counsel, and Vocational Expert (VE) Lynn Smith, appeared before Administrative Law Judge (ALJ) Edmund Round (Docket No. 10, p. 42 of 470).  On March 23, 2011, the ALJ rendered an unfavorable decision, finding that Plaintiff was not entitled to a period of disability and DIB (Docket No. 10, pp. 22-36 of 470).

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on September 21, 2012 (Docket No. 11, pp. 6-8 of 764).  Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).

### III.  FACTUAL BACKGROUND.

At the administrative hearing convened in Cleveland, Ohio, Plaintiff and the VE testified. A summary of their testimony follows.

### A.    PLAINTIFF'S TESTIMONY.

Plaintiff was 43 years of age, weighed 420 pounds and was 5'11" tall.  Having completed three quarters of the eleventh grade,  Plaintiff participated in some special education classes designed to assist with his reading, writing and spelling skills.  Although he had difficulty with spelling, pronunciation and using punctuation, Plaintiff considered himself functionally literate (Docket No. 11, pp. 37, 41, 42 of 764).  Plaintiff had a driver's license (Docket No. 11, p. 40 of

2

764).  A recovered smoker, Plaintiff had breathing problems[1], diabetes, [morbid] obesity, osteoarthritis and foot, knee and back pain.  He used Spiriva®[2] and a nebulizer to address breathing issues.  Plaintiff avoided cold weather which exacerbated his respiratory symptoms.  Upon being diagnosed with diabetes, Plaintiff modified his diet to the extent that he lost approximately 70 pounds.  Plaintiff was too heavy for the [examining] table; consequently, his physicians could not administer the drugs used to treat his osteoarthritis and back issues (Docket No. 11, pp. 38; 41-42; 45; 46; 47 of 764).

Plaintiff's employment history included work as an assembler, truck driver, landscaper, construction worker, dish washer and driving instructor (Docket No. 11, pp. 37, 40 of 764).  At the time he became disabled, Plaintiff was employed at Shelby Paper Company.  The physical impact of work performed at Shelby resulted in foot, knee and lower back pain.  Employed at a "groom house" for one day in 2006, Plaintiff experienced respiratory problems because the house lacked respiratory equipment.  Moreover, Plaintiff had to stand to perform his duties, causing further pain to his feet, knees and lower back (Docket No. 11, p. 387 of 764).

Because he found it difficult to find a chair that would accommodate his weight and girth, Plaintiff rarely ventured away from his home.  Plaintiff estimated that he could stand up to fifteen minutes before he had to sit down because of the pain in his feet and knees.  He could lift twenty-five pounds and carry it "a bit."  When packaging his groceries, Plaintiff distributed his purchases in several small bags to accommodate his ability to carry less than twenty-five pounds at a time.

---

[1]

The ALJ observed that Plaintiff had "a little short[ness] of breath here as you are talking to us today" (Docket No. 11, p. 44 of 764).

[2]

This medication's pharmacological effect is through inhibition of $M_3$-receptors at the smooth muscle that leads to bronchodilation. PHYSICIAN'S DESK REFERENCE, 2006 WL 361121 (2006).

Plaintiff was unable to walk long distances, ride a bicycle or exercise (Docket No. 11, pp. 42, 43-44 of 764).

Plaintiff explained that Dr. [Firas] Atassi, [M.D.] treated him five or six times since 2000 and now he was treating with a pulmonary specialist bimonthly.  In 2005, he was referred to a cardiologist for diagnostic testing.  There was no evidence of cardiovascular disease (Docket No. 11, p. 46 of 764).  Plaintiff had undergone pain management therapy without success (Docket No. 11, pp. 44; 45; 46 of 764).

During a "good" day, if his back was hurting and he was encountering muscle spasms, Plaintiff sat "out," watched television while lying sideways on the sofa and cooked dinner for his mother.  Plaintiff would even walk out to the mailbox which was approximately 100 feet from the house.  Occasionally, he would sit out in the backyard on the swing provided it was not humid (Docket No. 11, pp. 46, 47 of 764).  On bad days, he did not get out of bed.  Lying flat in bed gave him some relief from pain (Docket No. 11, p. 46 of 764).

###    B.    THE VE'S TESTIMONY.

The VE, a vocational rehabilitation counselor, appeared for the purpose of giving impartial opinion testimony as an expert witness.  Plaintiff's counsel did not object to her professional qualifications or her ability to testify as an expert (Docket No. 11, p. 48 of 764).  The VE affirmed that her testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a universal classification of occupational definitions and how the occupations are performed, and its companion publication[3] (Docket No. 11, p. 51 of 764; www.occupationalinfo.org).

---

[3]

The SELECTED CHARACTERISTICS OF OCCUPATIONS (SCO) is a companion volume to the United States Department of Labor's DOT.  It may be used to supplement data in the DOT.  SCODICOT APP. A (1993 ed.).

The following table represents the VE's categorization of the jobs that Plaintiff performed during the past fifteen years by exertional requirements, skill requirements and the amount of lapsed time required by a typical worker to learn the techniques, acquire the information and develop the facility needed for average performance in the specific job-worker situation (SVP):

| JOB AND DOT | PHYSICAL EXERTIONAL LEVEL | SKILL LEVEL | SVP |
|---|---|---|---|
| **PACKAGER**<br>**920.587-078** | **Medium work** involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  Generally medium work requires standing and walking six out of eight hours, use of arms and hands necessary to grasp, hold and turn objects with frequent bending and stooping. 20 C. F. R. §§ 404.1567(c); 416.967(b).<br><br>**Plaintiff performed this job on the heavy level** which involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  20 C. F. R. §§ 404.1567(d); 416.967(d). | **Unskilled work** needs little judgment or no judgment to do simple duties that can be learned on the job in short period of time. 20 C. F. R. §§ 404.1568(a); 416.967(d). | **2**--anything beyond short demonstration up to and including one month |
| **CONSTRUCTION WORKER**<br>**869.664-014** | Heavy | Semi-skilled work needs some skills but does not require doing the more complex work duties. 20 C. F. R. §§ 404.1568(b); 416.968(b). | 4–Over three months up to and including six months |
| **LANDSCAPING ARTIST**<br>**301.687-018** | Heavy | Unskilled | 2 |

(Docket No. 11, pp. 48-49 of 764; www.onetonline.org;).

1.    **THE FIRST HYPOTHETICAL QUESTION**:

The ALJ posed the following hypothetical question to the VE simply to "see what the answer was."  Assume a hypothetical worker was 42 years of age with a tenth grade education, no currently relevant vocational training and the ability to engage in a range of sedentary work, specifically, the hypothetical worker could:

(1) stand and/or walk for two hours during an eight-hour workday, (2) sit for six hours in an eight-hour workday; (3) lift/carry/push/pull a maximum of ten pounds all with

5

normal breaks; (4) not use ladders, ropes or scaffolds; (4) occasionally use stairs and ramps; (5) occasionally stoop, kneel, crouch and crawl; (6) avoid even moderate exposure to fumes, odors, dust, gases and poorly ventilated areas; (7) avoid even moderate exposure to temperature extremes in excess of 85° or less than 32°; and (8) avoid all exposure to workplace hazards such as unprotected heights, moving machinery and occupational driving.

The VE responded first, that the hypothetical individual could not perform any of Plaintiff's past work.  Second, none of the skills Plaintiff acquired in the past would transfer to work that the hypothetical worker could do (Docket No. 11, pp. 48-50 of 764).

### 2.  SECOND HYPOTHETICAL QUESTION.

Assuming that the hypothetical worker had the same experience as Plaintiff, the ALJ asked the VE to consider what work the hypothetical person of Plaintiff's age, education and past work experience and limitations could perform.  The VE determined that the following sedentary, unskilled jobs were available within the designated geographic areas and that they would generally require specific vocational preparation that went beyond a short demonstration up to and including one month:

| JOB | LOCALLY | STATE | NATIONAL |
|---|---|---|---|
| CHARGE ACCOUNT CLERK DOT 205.367-014 | 3,000 | 9,000 | 200,000 |
| LENS INSERTER DOT 713.687-026 | 3,000 | 16,000 | 295,000 |
| ORDER CLERK DOT 209.567-014 | 2,600 | 8,000 | 260,000 |

(Docket No. 11, pp. 50-51 of 764).

### 3.  THE THIRD HYPOTHETICAL QUESTION.

The ALJ asked that the VE assume that the lens inserter did not exist in the local economy.  The VE responded that the following sedentary, unskilled job would also be available in the following numbers:

| JOB | LOCALLY | STATE | NATIONAL |
|---|---|---|---|
| ASSEMBLER OF COMPACTS DOT 739.687-066 | 3,000 | 17,000 | 300,000 |

(Docket No. 11, p. 54 of 764).

### 4.  PLAINTIFF'S COUNSEL'S INQUIRY

Plaintiff's counsel made it a point to explain that when determining the numbers of jobs in the local economies, the Bureau of Labor Statistics takes the broader group of jobs which may incorporate jobs with different skill levels and then uses a mathematical formula to estimate how many of those might accommodate that particular DOT job (Docket No. 11, pp. 53-54 of 764).

Assuming as reliable the *Job Browser* software by Skill Tran Company[4], the VE was unable to determine if the jobs in the local economy were part-time or full time.  The VE explained that the numbers for the local economies were arrived at by entering the DOT number into the *Job Brower* program and cross-referencing the jobs with the designated county (Docket No. 11, pp. 55-56 of 764).

Counsel suggested and the VE agreed that an employer providing extra large seating for sedentary jobs would be a matter of employee accommodation (Docket No. 11, p. 63 of 764).

## IV.  MEDICAL EVIDENCE.

Medical evidence is the cornerstone in determining the claimant's eligibility for SSI or DIB. Therefore, each claimant is responsible for providing medical evidence showing that he or she has an impairment and the severity of that impairment.  20 C. F. R. §§ 404.1512(c), 416.912 (Thomson Reuters 2013).  The medical evidence generally comes from sources who have treated or evaluated the claimant for his or her impairment.  20 C. F. R. §§ 404.1512 (c), 416.912(b) (Thomson Reuters

---

[4]

    *JOB BROWSER Pro* is a MICROSOFT® WINDOWS software tool used for career exploration and planning.  The software interweaves the complete occupational text and images from the Occupational Outlook Handbook and standard government data with the DOT.  Www.skilltrans.com/jb_overview.html.

2013).

### 1.    NEPHROLOGICAL EXAMINATIONS AND TREATMENT.

As early as August 13, 2001, Plaintiff reported to Dr. Atassi that he had right flank pain.  Dr. Atassi attributed the pain most likely to nephrolithiasis[5].  Employing conservative treatment designed to dissolve the stones, Dr. Atassi prescribed a diet rich in the consumption of liquids.  He also prescribed a medication to assist with the pain (Docket No. 11, p. 675 of 764).

Plaintiff experienced flank pain for several weeks and presented to the MetroHealth Medical Center emergency room on April 13, 2005.  The computed tomographic (CT) scan showed no evidence of free fluid or tissue mass within the pelvis.  Emergency room physician Dr. Sandra Werner determined that Plaintiff had a kidney stone so she referred Plaintiff to the urology clinic (Docket No. 11, pp. 395-399; 536-537 of 764; www.vitals.com/doctors/Dr_Sandra_L_Werner.html).

On April 20, 2005, Dr. J. Patrick Spirnak, M.D., a urologist, conducted a dip blood analysis and confirmed that there was blood in Plaintiff's urine.  Consideration was given to dissolving the kidney stone with Urocit-K[6] (Docket No. 11, p. 401 of 764; www.healthgrades.com/physician/dr-j-patrick-spirnak-2j7w7).

After undergoing an abdominal examination on April 21, 2005, Plaintiff was diagnosed with a staghorn calculus[7] on the right.  There was no evidence of soft tissue masses (Docket No. 11, pp.

---

[5]

The presence of renal calculi.  STEDMAN'S MEDICAL DICTIONARY 270550 (27th ed. 2000).

[6]

Urocit-K is proven to inhibit the formation of most kidney stones in over 90% of patients.  Urocit-k.com.

[7]

Staghorn calculi refers to stones that fill all or part of the renal pelvis and branch into several or all of the calices.  STEDMAN'S MEDICAL DICTIONARY 60270 (27th ed. 2000).

535-536 of 764).

Dr. David I. Rosenblum, D.O., a radiologist, successfully placed a nephrostomy tube[8] within the lower and upper pole calyces of the right kidney on July 19, 2005 (Docket No. 11, pp. 527-531 of 764; www.healthgrades.com/physician/dr-david-rosenblum-xhx76).

There were some differences between the chest X-rays administered on July 21, 2005 and July 26, 2005:

1.    Right sided chest tube showed significant interval decrease in size of right pleural effusion.  Possible urinoma[9] as evidenced from "communication" of fluid from below the diaphragm.
2.    Right sided pleural catheter appears to be in the pleural space.
3.    Right sided percutaneous nephrostomy[10] tube was visualized in the proximal right ureter with the tip beyond the staghorn calculus.
4.    The overall appearance of the right posterolateral chest wall was significantly improved (Docket No. 11, pp. 435, 494-515 of 764).

The chest X-rays administered on July 21, 2005 and August 7, 2005, were compared.  Each clearly showed a stabilized chest tube.  Also, the loculated[11] pleural effusion on the right had decreased in size (Docket No. 11, p. 435 of 764).

The CT scan of the abdomen taken on July 21, 2005 showed:

1.    Status post right nephrostomy tube placement was indicative of apparent leakage of the more inferiorly placed tube in at least two sites.  Urine was collecting in the region of the posterolateral chest wall.

---

[8]

This is a catheter that is inserted through the skin into the kidney.  It diverts urine from the body into a collecting bag outside of the body.  Www.drugs.com/cg/nephrotomy-tube-care html.

[9]

A cyst containing extravasated urine.  STEDMAN'S MEDICAL DICTIONARY 427880 (27th ed. 2000).

[10]

Drainage of the collecting system through a catheter inserted through the skin of the flank under fluoroscopic control, usually using the Seldinger technique.  STEDMAN'S MEDICAL DICTIONARY 270810 (27th ed. 2000).

[11]

Containing numerous small cavities or chambers.  STEDMAN'S MEDICAL DICTIONARY, 231880, 231900 (27th ed. 2000).

9

2.      A large right pleural effusion (Docket No. 11, pp. 517-518 of 764).

Reviewed on July 26, 2005, the axial views from above Plaintiff's lung apices showed:

1.      Large loculated pleural effusion on the right with gas shadows.
2.      A large abscess in the right chest wall soft tissues (Docket No. 11, p. 519 of 764).

Plaintiff's heart was normal in size and appearance; however, the chest X-rays were most consistent with a loculated right plural effusion and right base atelectasis[12] (Docket No. 11, p. 520 of 764).

There was evidence that the right chest tube placed by the cardiothoracic services had occluded and was no longer draining.  On August 2, 2005, a catheter was placed into the right posterior pleural collection, approximately mid-level of the thorax.  There was successful drainage resulting almost immediately after insertion (Docket No. 11, pp. 486-488 of 764).

On August 4, 2005, a lumen peripherally inserted central catheter (PICC) line[13] was placed in Plaintiff's left arm.  This procedure was used to facilitate long-term central intravenous access (Docket No. 11, p. 492 of 764).

On August 9, 2005, Plaintiff was transferred from Oakridge Home to MetroHealth Hospital to treat the development of methicillin resistant staphylococcus aureus[14] in the right nephrostomy tube.  The physical therapist determined that it was inappropriate to subject Plaintiff to skilled therapy intervention on August 15, 2005 (Docket No. 11, pp. 376-377; 382 of 764; STEDMAN'S MEDICAL

---

[12]

Decreased or absent air in the entire or part of a lung, with resulting loss of lung volume.  STEDMAN'S MEDICAL DICTIONARY 36120 (27th ed. 2000).

[13]

A long-term central catheter inserted peripherally.  STEDMAN'S MEDICAL DICTIONARY 228820 (27th ed. 2000).

[14]

Commonly referred to as MRSA, this is a bacterium that causes infections in different parts of the body.  It's tougher to treat than most strains of staphylococcus aureus also referred to as staph because it's resistant to some commonly used antibiotics.  Www.webmd.com/MRSA.

DICTIONARY 270330 (27th ed. 2000)).

Plaintiff was seen by Dr. Robert Kalayjian, M. D., an infectious disease specialist, on August 24, 2005.  Plaintiff weighed 368 pounds and his body mass index was 51.53.  Dr. Kalayjian noted that the PICC line was clotted and that Plaintiff was tolerating the Vancomycin, an antibiotic (Docket No. 11, p. 378 www.healthgrades.com/physician/dr-robert-kalayjian-22gtr).

Plaintiff underwent a routine followup visit on August 25, 2005.  Dr. Roy Thomas Temes, M. D., a surgeon, commented that Plaintiff's problems included morbid obesity and renal stones.  Plaintiff's more pressing problems were the right empyema[15] secondary to a nephrostomy tube.  He drained a subcutaneous abscess and the empyema and removed the chest tube (Docket No. 11, pp. 437-438; 441 of 764; www.healthgrades.com/physician/dr-r-thomas-temes-xh3w7).

From blood collected on August 30, 2005, it was determined that Plaintiff's glucose, monocyte[16], eosinophil[17] and neutrophil[18] levels were elevated.  His red blood count was lower than what is typically considered normal (Docket No. 11, pp. 383-384 of 764).

Plaintiff presented to MetroHealth System on September 7, 2005 complaining of right flank

---

[15]

Pus in a body cavity; when used without qualification, refers specifically to pyothorax. STEDMAN'S MEDICAL DICTIONARY 128820 (27th ed. 2000).

[16]

A relatively large mononuclear leukocyte (16-22 μm in diameter), that normally constitutes 3-7% of the leukocytes of the circulating blood, and is normally found in lymph nodes, spleen, bone marrow, and loose connective tissue.  STEDMAN'S MEDICAL DICTIONARY 258880 (27th ed. 2000).

[17]

A polymorphonuclear leukocyte characterized by many large or prominent, refractile, cytoplasmic granules that are fairly uniform in size and bright yellow-red or orange when treated with Wright or similar stains; the nuclei are usually larger than those of neutrophils, do not stain as deeply, and characteristically have two lobes (a third lobe is sometimes interposed on the connecting strand of chromatin); these leukocytes are motile phagocytes with distinctive antiparasitic functions. STEDMAN'S MEDICAL DICTIONARY 226430 (27th ed. 2000).

[18]

A mature white blood cell in the granulocytic series, formed by myelopoietic tissue of the bone marrow (sometimes also in extramedullary sites), and released into the circulating blood, where they normally represent 54-65% of the total number of leukocytes.  STEDMAN'S MEDICAL DICTIONARY 273560 (27th ed. 2000).

pain.  It was more important to note that Plaintiff's right nephrostomy system was malfunctioning as his urine had not drained from it for the past two days.  A nephrostomy and nephroureteral catheter was ordered (Docket No. 11, pp. 439-440 of 764).

On September 9, 2005, Plaintiff underwent an examination to assess why there was poor drainage from the right percutaneous nephrostomy tube.  A guide wire was advanced into the tube, removing it and replacing it with another in the right renal pelvis.  There was noted interval improvement in the previously noted pleural fluid collection although there was a small amount of pleural fluid still within the right lung base (Docket No. 11, pp. 466-467; 472-473 of 764).

Results from the CT scan of the chest performed on September 6, 2005, showed improvement. There was no acute distress noted on September 15, 2005 (Docket No. 11, pp. 441-442 of 764).

Plaintiff underwent pre-surgical evaluations on September 30, 2005 and October 4, 2005, during which consideration was given as to whether he would undergo laser lithotripsy[19].  Although Plaintiff was considered severely obese, there were no cardiopulmonary issues.  Treatment was warranted for Plaintiff's moderate to severe obstructive sleep apnea (Docket No. 11, pp. 445-449; 450- of 764).

On October 10, 2005, Plaintiff underwent the successful placement of a glide catheter within the right distal ureter and a tube within the renal collecting system (Docket No. 11, pp. 452-460 of 764).

On November 17, 2005, Dr. Sarah McAchran, a urologist, performed a right percutaneous nephrolithotomy with the assistance of fellow urologists, Dr. Spirnak and Dr. Irina Taran, M. D.

---

[19]

The crushing of a stone in the renal pelvis, ureter, or bladder, by mechanical force or focused sound energy. STEDMAN'S MEDICAL DICTIONARY 231010 (27th ed. 2000).

Although Plaintiff tolerated the procedure well, there was no significant fragmentation of his stone burden.  An additional procedure was scheduled for November 22, 2005 (Docket No. 11, pp. 558-564 of 764; www.ucomparehealthcare.co/drs/sarah_mcachran/hospital.html).

On December 1, 2005, Plaintiff was prescribed medication used to treat gout, a disease characterized by a raised but variable blood uric acid level and severe recurrent acute arthritis of sudden onset (Docket No. 11, p. 569-572 of 764; STEDMAN'S MEDICAL DICTIONARY 168070 (27th ed. 2000)).

Dr. Christopher A. Haas, M. D., a urologist, treated the inflammation surrounding the tube exiting from his right flank region on December 2, 2005.  Plaintiff's cell count showed the presence of intracellular and extracellular monosodium urated[20] crystals (Docket No. 11, pp. 566-567; 577 of 764; www.healthgrades.com/physician/dr.+christopher+a+haas).

On December 7, 2005, the two residual functional pole fragments remained and they appeared to be unchanged.  The upper pole fragment was no longer well seen and Plaintiff's ureter was partially obstructed by a large stone in the proximal ureter (Docket No. 11, p. 579 of 764).

On December 7, 2005, Dr. McAchran advised that because Plaintiff had a tube in his left kidney, heavy lifting was contraindicated pending the tube's removal.  She projected that Plaintiff's treatment would continue until February 2006.  Dr. Spirnak concurred with Dr. McAchran's findings and further recommended that because Plaintiff's acid-alkaline (pH) was unbalanced, he should continue taking the prescribed medication pending further X-rays (Docket No. 11, pp. 549; 557 of 764).

Approximately 2½ years later on May 14, 2008, Plaintiff underwent a transthoracic

---

[20]

A salt of uric acid.  STEDMAN'S MEDICAL DICTIONARY 426180 (27th ed. 2000).

echocardiogram.  The results suggested possible volume overload and further evaluation was suggested (Docket No. 11, pp. 655-656 of 764).

On June 19, 2008, Plaintiff presented to the EMH Regional Medical Center complaining of left flank pain.  Plaintiff was admitted to rule out renal stones and pyelonephritis[21] (Docket No. 11, pp. 652-653 of 764).

Plaintiff presented to Dr. Atassi on December 15, 2009, complaining of recurrent kidney stones.  Considering Plaintiff's obesity and recurring kidney stones, Dr. Atassi prescribed Donnatal tablets for recurring kidney stones with a recommendation that Plaintiff drink at least eight glasses of liquid (daily) (Docket No. 11, pp. 675; 697-698 of 764).

On August 8, 2010, Plaintiff presented to the EMH Regional Healthcare System in Elyria, Ohio complaining of right flank pain.  Results from the songraphic imaging of the kidneys showed enlarged kidneys, the left measuring larger in size than the right.  There was echogenic foci within the kidneys bilaterally.  Diagnosed with hydronephrosis[22], the examiner found that the left collecting system was within normal limits (Docket No. 11, pp. 749-750; 751-752 of 764).

Plaintiff presented to Westshore Primary Care on September 4, 2010, with kidney stone pain. Medication was prescribed for the pain and diagnostic tests were ordered to determine the content of uric acid (Docket No. 11, p. 758 of 764).  On September 8, 2010, a limited renal sonogram was performed and the results showed that both kidneys were prominent in size probably reflecting

---

[21]

Inflammation of the renal parenchyma, calices, and pelvis, particularly due to local bacterial infection. STEDMAN'S MEDICAL DICTIONARY 343260 (27th ed. 2000).

[22]

Dilation of the pelvis and calices of one or both kidneys. This may result from obstruction to the flow of urine, vesicoureteral reflux, or it may be a primary congenital deformity without an apparent cause.  Stedman's Medical Dictionary 188840 (27th ed. 2000).

inflammation.   Bilateral nephrolithiasis was noted and mild left hydronephrosis was observed
(Docket No. 11, p. 759 of 764).

    **2.  RESPIRATORY DISEASE.**

Plaintiff was treated on March 23, 2008, at the EMH Regional Medical Center, Elyria, Ohio
campus, for cough, congestion, fever and pain in the chest.  Plaintiff was diagnosed and treated for
pneumonia (Docket No. 11, p. 591-597 of 764).

Plaintiff presented to the EMH Regional Medical Center, Avon, Ohio campus on April 2,
2008 with a cough that had lingered for a period of two weeks.  Plaintiff suffered some chest pain
with the cough.  There was no evidence of active disease in his chest (Docket No. 11, pp. 598-601;
631 of 764).

On April 25, 2008, Dr. Chandra V. Singh, M. D., a pulmonary medicine specialist, evaluated
Plaintiff for dyspnea accompanied by wheezing, a cough, chest congestion and left sided pleural chest
pain that had been persistent for one month's duration.  The CT scan of the thorax showed a small
amount of vague soft tissue density within the anterior mediastinum (Docket No. 11, pp. 628-630 of
764).  Working from a clinical diagnosis of COPD with bronchospasm, Dr. Singh dispensed samples
of medicine designed to assist breathing, encouraged Plaintiff to continue exercising and dieting and
ordered tests to rule out deep vein thrombosis (DVT) and COPD.  Incidentally, on April 25, 2008,
Plaintiff weighed 375.4 pounds (Docket No. 11, pp. 604; 610-611; 693 of 764).

On April 28, 2008, Plaintiff underwent a sleep disorder study and CT scan.  Results from the
sleep study confirmed respiratory muscle weakness (Docket No. 11, pp. 607-609 of 764).  Results
from the CT scan suggested the presence of an intracardiac septal defect and the possibility of an
acute pulmonary embolus (Docket No. 11, pp. 626-627 of 764).

Based on the results from the April 28, 2008 examination, Dr. Singh referred him for a cardiac evaluation (Docket No. 11, pp. 624-625 of 764).

On May 22, 2008, Dr. Razak U. Kherani, M. D., a cardiologist, confirmed the presence of intracardiac septal defect and mildly enlarged right ventricular size with normal systolic function on the right ventricle (Docket No. 11, pp. 619-623 of 764; www.healthgrades.com/physician/dr-razak-kherani-3kqdh).

On May 7, 2008, Dr. Singh determined that the chest pain had resolved, that the COPD was mild and the ultrasound of the lower extremities was negative for DVT.  Plaintiff was encouraged to lose weight using diet and exercise (Docket No. 11, pp. 614-615; 706-707 of 764).

The transthoracic Doppler study administered on May 14, 2008, showed possible atrial septal defect (Docket No. 11, pp. 665-666 of 764).

Plaintiff underwent a transesophageal echocardiogram on July 21, 2008.  The results showed:

1.  Normal left ventricular systolic function;
2.  Normal chamber sizes;
3.  Normal pericardium;
4.  Normal aorta;
5.  No significant valvular heart disease; and
6.  Negative contrast for atrial septal defect or patent foramen ovale[23] (Docket No. 11, pp. 661-662 of 764).

Dr. Singh noted on November 14, 2008, that Plaintiff needed a methacholine challenge test or confirmation that he did not have asthma or other bronchial dysfunction.  Although limited by shortness of breath and obesity, the chest pain and work-up were negative (Docket No. 11, pp. 690-691; 701-703 of 764; www.ncbi.nim.nih.gov/pubmed/1870211).

---

[23]     A hole between the left and right atria (upper chambers) of the heart that fails to close naturally soon after birth. Www.ncbi.nih.gov.pubmed/health/patentforamenovale.

The results from the pulmonary function study conducted on February 12, 2009, was suggestive of severe obstructive and restrictive lung disease with significant improvement when using a bronchodilator, suggestive of a reversible airway disease (Docket No. 11, p. 723 of 764).

Plaintiff presented to Dr. Singh on February 26, 2009, with a cough accompanied by dyspnea, wheezing, sputum production and chest congestion.  Because he had no health insurance, he had been noncompliant with taking medications for high blood pressure and his respiratory problems (Docket No. 11, pp. 721-722 of 764).

On May 21, 2009, Dr. Singh addressed the complications that arose from Plaintiff's failure to use the CPAP machine.  Dr. Singh opined that Plaintiff was doing well on the present drug therapy (Docket No. 11, pp. 688-689 of 764).

Plaintiff was seen by Dr. Kherani on December 17, 2009 for an annual examination.  Dr. Kherani acknowledged that Plaintiff was hypertensive and had dyspnea; however, from a cardiac standpoint, Plaintiff was stable.  Dr. Kherani recommended that Plaintiff stay the course–continue his medication, exercise regularly and observe diet restrictions (Docket No. 11, pp. 677-678; 694-696 of 764).

At the Respiratory and Sleep Disorder clinic, Plaintiff reported on January 6, 2010, that he simply could not use the continuous positive airway pressure (CPAP) machine.  Dr. Singh dispensed a sample of Spiriva® at Plaintiff's request.  At this juncture, Plaintiff weighed 356 pounds (Docket No. 11, pp. 686-687 of 764; STEDMAN'S MEDICAL DICTIONARY 93360 (27th ed. 2000)).

Also on January 6, 2010, Dr. Singh completed a BASIC MEDICAL form prepared for and provided by Job and Family Services, on which she described Plaintiff's medical conditions as:

1. COPD;
2. Sleep Apnea; and

3.  Dyspnea.

It was her opinion that Plaintiff was limited with dyspnea.  Plaintiff was advised to reduce his weight (Docket No. 11, pp. 693-694 of 764).

On May 14, 2010, Plaintiff was evaluated for an update on his respiratory status.  Plaintiff had recently quit chewing tobacco and he continued to be noncompliant with the use of his CPAP machine.  His weight had increased to 446 pounds.  Dr. Singh diagnosed Plaintiff with chronic airway obstruction, not elsewhere classified, dyspnea and respiratory abnormality, obesity and exacerbation of COPD.  Dr. Singh advised  Plaintiff to continue using the inhaler, lose weight and quit tobacco use.  Plaintiff continued to not use the CPAP machine (Docket No. 11, pp. 682-685 of 764).

**4.  BILATERAL KNEE, FEET AND BACK PAIN.**

As early as December 2, 2005, there was diagnostic evidence of suprapatellar joint effusion in Plaintiff's left knee.  There was no diagnostic evidence of fracture or dislocation (Docket No. 11, pp. 575-576 of 764).

On May 28, 2008, Dr. Mehdi Saghafi, M. D., a general surgeon/family practitioner, interpreted the X-rays of Plaintiff's left knee as evidence of "spurring of tibial spines," a feature of osteoarthritis.  Even with Plaintiff's history and objective physical findings, Dr. Saghafi opined that Plaintiff was able to do the following:

1.  Sit six to eight hours per day;
2.  Stand and walk without an ambulatory aid;
3.  Lift and carry ten to twenty pounds of weight on a frequent basis;
4.  Lift and carry 21-50 pounds of weight occasionally;
5.  Push and pull objects on occasion;
6.  Manipulate objects and operate hand and foot controlled devices;
7.  Drive a motor vehicle and travel;
8.  Climb stairs occasionally;
9.  Raise his shoulders, elbows, wrists, fingers, hips, knees and feet against maximal resistance;

18

10.  Move his cervical spine, shoulders, elbows, wrists, hands-fingers, dorsolumbar spine, hips and ankles the distance and direction to its full potential.

11.  Move his knees slightly less than the distance and direction of its full potential (Docket No. 11, pp. 633-634; 635-638; 639 of 764; www.healthgrades.com/physician/dr-mehdi-saghafi-xh3ys).

Plaintiff presented to Dr. Atassi on June 30, 2008 with complaints that his back pain was worsening.  Considering that Plaintiff's pain was most likely the result of degenerative osteoarthritis, Dr. Atassi gave back care instructions and prescribed a pain reliever (Docket No. 11, p. 675 of 764).

After the examination, Dr. Atassi completed the BASIC MEDICAL prepared for and provided by Ohio Job and Family Services, opining that Plaintiff's dyspnea was interrelated with his obesity. As a result, Plaintiff was markedly limited in his ability to push/pull and bend, he could stand/walk for fifteen minutes and he could only lift up to five pounds (Docket No. 11, pp. 703-704 of 764).

Plaintiff presented to Westshore Primary Care on March 16, 2010, March 25, 2010 and again on April 19, 2010, complaining of back pain.  The examiner could not perform an X-ray of the kidneys, bladder and ureters including the urinary tract because of Plaintiff's weight.  Plaintiff was prescribed drugs to relieve musculoskeletal pain (Docket No. 11, pp. 740-741; 744 of 764).  Three radiological views of Plaintiff's lumbar spine taken on March 24, 2010, showed minimal degenerative findings (Docket No. 11, p. 728 of 764).

In April 2010, a consultative examination was conducted by Dr. Abdallah I. Kabbara, M. D., an anesthesiologist and pain management specialist, to address Plaintiff's complaints of low back pain. Explaining that Plaintiff's weight was the crux of his problems, Dr. Kabbara suggested gastric bypass surgery and the use of other modalities to assist with pain, including physical therapy.  Dr. Kabbara offered Plaintiff lumbar epidural steroid injections once his weight was reasonable (Docket No. 11, pp. 725-727 of 764; www.healthgrades.com/physician/dr-abdallah-kabbara-yclfk).

On May 4, 2010, apparently Plaintiff called Westshore Primary Care and requested pain medication. This request was rejected unless and until Plaintiff was seen in person by staff (Docket No. 11, p. 764 of 764).

On June 21, 2010, Plaintiff presented to Westshore Primary Care for treatment of back pain. Percocet was prescribed for pain and Plaintiff was encouraged to lose weight (Docket No. 11, pp.

### 3. PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS
### A. 2005.

Working with the diagnoses of sleep apnea and renal calculus, Dr. Gary Demuth completed the PHYSICAL RESIDUAL FUNCTIONAL CAPACITY assessment on November 24, 2005. It was his opinion that Plaintiff was partially credible; however, the renal calculus would not last twelve months and that the sleep apnea could possibly be non-severe in less than twelve months. Dr. Demuth further opined that Plaintiff should avoid "even moderate exposure" to all hazards, machinery and heights; otherwise, he had no communicative, exertional, manipulative, postural or visual limitations (Docket No. 10, pp. 539-546 of 764).

### B. 2008.

Considering that Plaintiff had been diagnosed with knee pain, dyspnea and obesity, Dr. Anton Freihofner, M. D., opined that Plaintiff had no manipulative, visual or communicative limitations and that he should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. His exertional limitations were subject to the following restrictions:

1. Occasionally lifting and/or carrying fifty pounds;
2. Frequently lifting and/or carrying twenty-five pounds;
3. Standing and/or walking about six hours in an eight-hour workday;
4. Sitting with normal breaks for a total of about six hours in an eight-hour workday;
5. Pushing and/or pulling on an unlimited basis; and
6. Occasionally climbing using a ramp/stairs and never climb using a ladder/rope/scaffold (Docket No. 11, pp. 641-648 of 764).

20

## V.  THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB is available only for those who have a "disability."  *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 2d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits  . . . physical or mental ability to do basic work activities."  *Id*.  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*  For the fifth and final step, even if the

21

plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6ᵗʰ Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VI. THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings:

1.  At step one, Plaintiff met the insured status requirements of the Act through June 30, 2010.  He had not engaged in substantial gainful activity since June 6, 2005, the alleged onset date.

2.  At step two, Plaintiff had severe impairments, namely, obesity, chronic COPD, the residual effects of emphysema of the lungs and obstructive sleep apnea.

3.  At step three, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Moreover, Plaintiff had the residual functional capacity to do a range of sedentary work, specifically, he could:

    a.  Lift, carry, push and/or pull a maximum of ten pounds;
    b.  Sit for six hours;
    c.  Stand and/or walk for two hours in an eight-hour workday with normal breaks.

    Plaintiff must observe the following limitations:

    a.  Avoid all exposure to work place hazards and even moderate exposure to temperature extremes, humidity, fumes, odors, dust, gases and poorly ventilated areas.
    b.  Avoid occupational driving.

4.  At step four, Plaintiff was unable to perform any past relevant work.

5.  At step five, Plaintiff was 38 years of age on the day his disability began and he was

22

42 years of age or a younger individual at the time of hearing.  Plaintiff had a limited education and he was able to communicate in English.

6.  Considering his age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  Plaintiff has not been under a disability, as defined in the Act from June 6, 2005 through the date of this decision.

(Docket No. 11, pp. 20-26 of 764).

## VII.  STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*.  *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011).  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).  "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).

The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence.  *Id*. at 740-741.  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on record.  *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)).  In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  *Id.*

23

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers.  *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts."  *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)).  Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)).  However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII. PLAINTIFF'S ARGUMENTS.

Plaintiff seeks reversal and remand for re-adjudication.  Plaintiff argues that the ALJ's decision is not based on substantial evidence given the harmful errors made in determining that Plaintiff was not under a disability.  Specifically, Plaintiff contends that the ALJ failed to:

1. Evaluate treating physician Dr. Atassi's opinion that he was markedly limited in the ability to bend;
2. Address the VE's testimony that an employer accommodation would be necessary;
3. Address the fact that the VE provided no job incidence data for full-time jobs and rather, relied on incorrect job incidence data;
4. Consider the post-hearing evidence;
5. Make an appropriate credibility finding.

## IX. ANALYSIS.

### 1. DR. ATASSI'S OPINION.

Plaintiff points out that in December 2009, Dr. Atassi, his treating physician, opined that

24

Plaintiff had a markedly limited ability to bend.  The ALJ mentioned but did not specifically or expressly evaluate the marked limitation in bending when determining whether Plaintiff could perform sedentary work.  Sedentary work requires occasional stooping.  Stooping is defined as bending the body downward and forward by bending the spine at the waist.  Plaintiff argues that a finding that he can perform sedentary work is inconsistent with Dr. Atassi's determination that Plaintiff was markedly limited in his ability to perform sedentary work.

### A. THE LAW.

It is well established that the Commissioner has elected to impose certain standards on the treatment of medical source evidence.  *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011) (*citing* 20 C.F.R. § 404.1502).  Under the treating physician rule, the Commissioner has mandated that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record."  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  If the ALJ declines to give a treating source's opinion controlling weight, he or she must then balance the following factors to determine what weight to give it, specifically, the "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Id.* (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir.2004) (*citing* 20 C.F.R. § 404.1527(d)(2)).  Furthermore, the Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion."  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator

25

gave to the treating source's medical opinion and the reasons for that weight." *Id.* (*citing* TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, SSR 96-2p, 1996 WL 374188, *1 (1996)).

    **B. THE APPLICATION OF THE LAW.**

Plaintiff suggests that simply, the ALJ erred in failing to attribute substantial weight to the opinion of his treating physician, Dr. Atassi, on the BASIC MEDICAL form that his ability to bend was markedly impaired.  The Magistrate finds that Plaintiff's argument lacks merit for several reasons.

First, Dr. Atassi is not a treating physician.  The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his or her maladies over a long period of time will have a deeper insight into the medical condition of the claimant.  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994).  A detailed review of the medical evidence shows that Dr. Atassi saw Plaintiff three times over an eight-year period (Docket No. 11, p. 675 of 764).  During the August 13, 2001 visit, he concluded that "most likely, Plaintiff had kidney stones so he prescribed medication and admonished Plaintiff to drink plenty of fluids.  Seven years later on June 30, 2008, Dr. Atassi acknowledged that Plaintiff had a kidney stone removed four years earlier and that he had lower back and breathing problems.  Dr. Atassi conducted a straight leg raise test and concluded that Plaintiff's pain was most likely degenerative osteoarthritis.  Later that day he opined in a BASIC MEDICAL form prepared for and provided by the Ohio Job and Family Services, that Plaintiff has marked limitations in the abilities to push/pull and bend.  Finally, on December 15, 2009, Dr. Atassi acknowledged the kidney stones, suggested that Plaintiff drink lots of water and prescribed medication.  Dr. Atassi's treatment notes are conclusory, inadequately explained and not supported by specific clinical and laboratory diagnostic techniques.  These three visits over an eight year time

span   fail to establish that Dr. Atassi had an ongoing treatment relationship with Plaintiff. Accordingly, the ALJ was not required to consider Dr. Atassi's findings as the opinion of a treating physician.  Consequently, he was not required to provide "good reasons" for discounting Dr. Atassi's opinions.

Second, because the Ohio Job and Family Service's regulations and standards in assessing "marked" limitations may not have the same force and effect as the statutes and regulations of the Social Security Administration, the ALJ was not bound by decisions made by Dr. Atassi on the BASIC MEDICAL form.

Third, Dr. Atassi's opinion, generally, is not supported by the results from his evaluations, observations, history of conservative treatment or objective clinical or laboratory findings.

Fourth, the ALJ did not ignore the answers on the BASIC MEDICAL form.  He explained the consideration given to Dr. Atassi's opinion that Plaintiff had a marked limitation in bending.  The ALJ's categorical assessment and decision to discount Dr. Atassi's opinion was not clearly erroneous.

The Magistrate finds that it was incumbent upon the ALJ to acknowledge Dr. Atassi, consider whether he was a treating physician and articulate the weight and supporting reasoning for a decision to reject Dr. Atassi's opinions.  The ALJ complied with the rules, identifying Dr. Atassi's opinions and explaining the reasons for giving his opinions less weight.  Since Dr. Atassi was not a treating physician, the ALJ did not violate the treating physician rule.

### 2.  ACCOMMODATION FOR PLAINTIFF'S OBESITY.

Plaintiff also argued that the ALJ failed to consider the VE's testimony that Plaintiff required an employer accommodation.  Specifically, the employer would have to provide an extra-large seat to accommodate Plaintiff's weight and girth.  The jobs provided by the VE at step five of the

sequential evaluation do not incorporate such accommodation.

### A. THE LAW.

The American with Disabilities Act (ADA) prohibits discrimination against a qualified individual with a disability on the basis of the disability in regard to the terms and conditions of employment. 42 U. S.C. § 12112(a) (Thomson Reuters 2013). A qualified person with a disability is defined as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8) (Thomson Reuters 2013). Reasonable accommodation may include making existing facilities readily accessible to and usable for individual with disabilities. 42 U.S.C. § 12111 (9) (Thomson Reuters 2013).

In contrast, the Social Security Administration's (SSA) definition does not consider whether the individual can work with reasonable accommodations. *Griffin v. Wal-Mart Stores*, *Incorporated*, 135 F. 3d 376, 380 (6th Cir. 1998) *cert. denied*, 119 S. Ct. 2018 (1999). Accordingly, the SSA does not consider whether an individual is able to work with a reasonable accommodation in determining entitlement to disability benefits. *Id.* In fact, when the SSA determines whether an individual is disabled for purposes of DIB or SSI, it does not even consider the possibility of reasonable accommodation. *Id.*

### B. THE APPLICATION OF THE LAW.

Plaintiff's weight at the time of the ALJ hearing may dictate the need for a large chair to accommodate him. However, it is a mischaracterization of the procedural analysis for obesity to require the ALJ to determine whether an employer accommodation would be necessary. It is immaterial for purposes of Social Security Disability determinations whether or not one could work

if provided with reasonable accommodations, whereas for ADA purposes, this inquiry is critical.  The question of accommodation is neither relevant, probative nor dispositive of Plaintiff's DIB or SSI claims of disability.

###### 3.  PART-TIME WORK.

Plaintiff contends that the VE's testimony at step five of the sequential evaluation is not supported by substantial evidence as she failed to articulate which jobs, if any, represented full time jobs.

###### A.  THE LAW.

Under TITLES II AND XVI:  ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2 (July 02, 1996), an ALJ must make its residual functional capacity determination based upon full-time work which is defined as "8 hours a day, for 5 days a week, or an equivalent work schedule."  Prior to the enactment of SSR 96–8p, the Sixth Circuit regarded part-time work as "substantial work activity," thus permitting an ALJ to conclude that a claimant was capable of working even if the claimant's residual functional capacity only permitted him or her to work part-time.  *Janda v. Commissioner of Social Security*, 2013 WL 3200611, *7 (N.D.Ohio,2013) (*See Conn v. Secretary of Health & Human Services*, 51 F.3d 607, 610 (6th Cir.1995); *see also Davis v. Secretary of Health & Human Services*, 915 F.2d 186, 189 (6th Cir.1990)).  SSR 96–8p changed this line of thinking and required the ALJ's residual functional capacity to be based on the claimant's ability to perform full-time work.  *Id.* (*See DeRossett v. Astrue,* No. 7:09–CV–00046, 2009 WL 4169489, at *5 (E.D.Ky. Nov.20, 2009) (unreported)).  Thus, SSR 96–8p is only relevant to step five of the sequential process because it relates to the ALJ's determination of residual functional capacity which is used to determine whether an individual is

capable of performing other work in the event that he or she is unable to perform past relevant work or in situations where the claimant has no past relevant work.  *Id*.

### B.  APPLICATION OF THE LAW.

Counsel's characterization of the rule to impose an additional burden on the VE to only identify the availability of full time jobs is an overstatement.  When the burden shifts at step five of the sequential analysis to determine whether there are jobs that exist in significant numbers in the national economy, the designation of work as part or full-time is material to the ALJ's determination of a social security claimant's residual functional capacity to the extent that he or she is unable to perform past relevant work or he or she has no past relevant work.

The regulations, however, do not impose a duty on the VE to differentiate the designated jobs that the social security claimant can perform in terms of whether the jobs are part or full-time. Neither has Plaintiff identified case law that requires the ALJ to ask whether the VE's testimony factored in the reduction of part-time jobs, if any.

The undersigned Magistrate declines to find that it was *per se* error for the ALJ to accept the VE's testimony despite her inability to definitively state whether the job incidence figures included part-time employment.


### 4.  POST HEARING EVIDENCE.

Plaintiff argues that the ALJ promised to consider the new evidence submitted post-hearing for the purpose of demonstrating that the VE's testimony was inconsistent with government data. Plaintiff contends that the ALJ abused his discretion in failing to consider the exhibits which included proof that the VE did not identify significant numbers of the three occupations identified.

### A.  THE LAW.

Under the plain language of the regulations, the ALJ has the discretionary power to leave the record open and to receive material post-hearing evidence.  An ALJ may reopen a hearing at any time before he or she mails a notice of the decision in order to receive new and material evidence.  20 C. F. R. §§ 404.944, 416.1544 (Thomson Reuters 2013).  The ALJ may decide when the evidence will be presented and when the issues will be discussed.  20 C. F. R. §§ 404.944, 416.1544 (Thomson Reuters 2013).

### B.  APPLICATION OF THE LAW.

The ALJ definitely stated that he "wanted to look at the numbers from the source" that the VE used (Docket No. 11, p. 59 of 764); and that he looked forward to seeing Plaintiff's brief (Docket No. 11, p. 64 of 764).  The ALJ considered the post hearing brief as promised.  The ALJ did not consider the attachments to the *Job Brower Pro* evidence as there was no indicia of reliability or accuracy (Docket No. 11, p. 26 of 764).  In other words, the ALJ exercised his right to decide what was necessary to supplement the full presentation of the testimony of the VE.  The ALJ did not abuse his discretion in refusing to give evidentiary weight to the post hearing attachments.

Neither did the ALJ act arbitrarily.  The Magistrate is persuaded that *Job Browser Pro* is based on reliable methodology and it does not undermine the determination of the number of local and national jobs.  However, *Job Browser Pro* is a program that is not included on the list of published sources in 20 C. F. R. § 404.1566(d) from which administrative notice of reliable job information **will** be taken.  Under the current regulations, any conflicts arising in the opinion evidence and the job information data will be resolved consistent with the occupational information supplied by DOT.  POLICY INTERPRETATION RULING:  TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND

31

VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, SSR 00-4p, 2000 WL 1898704, *2 (December 4, 2000).

The ALJ was clearly entitled to "see" the results that counsel obtained after filtering the jobs presented by the VE through *Job Browser Pro*. Under the present status of the regulations, the ALJ was not bound by the results. The decision to consider this evidence redundant, under these circumstances, was appropriate.

### 4. THE SPECIFIC DOT OCCUPATIONS

Plaintiff claims that the Commissioner's step five burden could not be satisfied because the VE improperly relied on the OCCUPATIONAL EMPLOYMENT SURVEY (OES) job-incidence data and the ALJ failed to rule on the objection that the job incidence data included part-time work.

I.

In the instant case, the VE identified three jobs a person with Plaintiff's residual functional capacity and vocational factors could perform in the national economy, specifically, 300,000 charge account clerk jobs, 295,000 lens inserter jobs and 260,000 order clerk jobs. Upon cross-examination, the VE admitted that in DOT, these jobs were presented in groupings of similar occupations requiring similar skills to perform. For instance, the charge account clerk job had six jobs in its grouping and that the order clerk had eleven jobs in that grouping. Within these groupings from which the VE pulled her statistics, she was unable to make her testimony anymore specific than she had (Docket No. 11, pp. 53-54 of 764). Consequently, within each group there was probably other work that the hypothetical worker could perform (Docket No. 11, p. 54 of 764). The jobs in DOT and the relevant counties were then filtered through the *Job Brower Pro* to determine the amount of local and regional jobs available in the specific grouping (Docket No. 11, p. 58 of 764).

The VE's role in these cases is to assess the effect of any limitation on the range of work at

32

issue (e.g., the potential occupational base); advise whether the impaired person's residual functional capacity permits him or her to perform substantial numbers of occupations within the range of work at issue; identify jobs which are within the residual functional capacity, if they exist; and provide a statement of the incidence of such jobs in the region in which the person lives or in several regions of the country.  *See* TITLES II AND XVI: CAPABILITY TO DO OTHER WORK--THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING EXERTIONAL LIMITATIONS WITHIN A RANGE OF WORK OR BETWEEN RANGES OF WORK, 1983 WL 31253, *1, SSR 83-12 (1983).  During the hearing in this case, the VE admitted that these figures were based on occupational "groups" that comprise several types of occupations within the range of work for which Plaintiff was deemed qualified.

The Magistrate agrees that the data from OES is all inclusive listing of job as it includes job groupings; however, the VE testified that she also based the incidence data on other sources such as the Bureau of Labor Statistics and that she filtered the jobs through the *Job Browser* to provide a statement of incidence of such jobs in the region where Plaintiff lived (Docket No. 11, pp. 51-54 of 764).  Plaintiff does not challenge the VE's use of other occupational market information for job incidence data.  Neither does Plaintiff contend that the use of the *Job Browser Pro* as a filter to determine the substantial numbers of occupations within a particular locality was inappropriate. Accordingly, the Magistrate cannot find the VE's job incidence figures improper for the reason that the VE complied with the rules, doing exactly what she was engaged to do:  identify substantial numbers of occupations within the range of work at issue and then determine the numbers of jobs in the region where Plaintiff lives.  Because the VE's testimony was based upon numerous sources of information, Plaintiff's argument which undermines the testimony based on an overabundance of information is weakened.  Plaintiff failed to present any case law or other authoritative source that

33

dictates further consideration on this issue.  In this instance, the ALJ's decision to rely on the VE's job-incidence figures was appropriate.

II.

Plaintiff claims that he objected to the VE's reliance on data that included part-time jobs and the ALJ failed to rule on this objection.

Plaintiff did not challenge the ALJ's residual functional capacity determination based on his ability to perform only part-time work.  Counsel was persistent that the VE must determine if the recommended jobs are full-time or part-time.  Upon cross-examination, the VE attempted to explain that she did not believe that the occupations in *Job Browser* were part-time jobs.  The VE never conceded that the jobs were part-time in nature:

> Counsel:  The data used for local occupations in *Job Browser*, those include both part-time and full-time jobs; isn't that correct?
>
> VE:  I don't really know to tell you the truth.  I'm sure it's probably full-time.
>
> Counsel:  But it could include part-time jobs?
>
> VE:  It may.
>
> Counsel:  There is no way of telling how many of the jobs that you mentioned in the local economy are part-time versus full-time?
>
> ALJ:  Assuming there are part-time jobs in Job Brower, which you don't know right?
>
> VE:  No, I don't know.
>
> Counsel:  So you are not certifying to us that these are all full-time jobs that you mentioned. There may have been some part-time jobs in there with those; isn't that right?
>
> VE:  I have no idea . . .
>
> Counsel:  So if these aren't full-time jobs, they may well not be substantial gainful activity jobs; isn't that correct?
>
> ALJ:  Well, stop.  Some of them may be part-time.  We understand that.  If they're minimum wage, they are probably not substantial gainful activity.  But since we don't' know how many are part-time, we don't know . . . Everything beyond that is speculation or simple math. . . .
>
> Counsel:  If you could just explain for us where the numbers of 3,000 and 3,000 and 2,600 were derived?  Exactly what's your methodology for part-time, full-time, whatever those are?  Where did you get those numbers?
>
> VE:  The numbers come through entering the DOT code in *Job Browser* and putting in counties, the name of counties and adding the numbers up (Docket No. 11, pp. 55-57

34

of 764).

The Magistrate finds that Plaintiff's argument is based on a misinterpretation of the VE's testimony. The VE refused to speculate whether the DOT was unreliable because it improperly counted part-time positions. Counsel continued a discussion with the ALJ and ultimately volunteered to put his thoughts in a brief (Docket No. 11, pp. 59-63 of 764). There was no objection which necessitated a ruling by the ALJ.

The Magistrate is persuaded that neither the VE nor the ALJ must make a determination as to whether the jobs recommended are full or part-time work as there is no legal precedent, law or regulation that requires the VE or the ALJ to do so. As the Court determined in *Janda*, *supra*, it was not *per se* error for the ALJ to accept the VE's testimony despite her inability to state definitively whether the job incidence figures included part-time employment.

### 5.  CREDIBILITY

Plaintiff contends that the ALJ's credibility finding does not incorporate his use of medication, work history or activities of daily living as the rules require. In other words, the ALJ did not identify the specific reasons for the credibility finding. This prevents meaningful review.

### A.  THE LAW.

The Commissioner and his examiner, as the fact-finders, are authorized to pass upon the credibility of the witnesses and weigh and evaluate their testimony. *Lucas v. Astrue,* 2013 WL 1150026, *10 (N.D.Ohio,2013) *report adopted by* 2013 WL 1150019 (N.D.Ohio 2013) (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir.2001), *quoting Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir.1972)). If a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, then the ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other

symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 96–7p. *Id.*

(*See* TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE

CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96–7p, 1996 WL 374186, *1 (1996); 61

Fed. Reg. 34483, 34484–34485 (1990)).  These factors include:

(1)  the claimant's daily activities;
(2)  the location, duration, frequency and intensity of the pain;
(3)  precipitating and aggravating factors;
(4)  the type, dosage, effectiveness and side effects of any pain medication;
(5)  any treatment, other than medication, that the claimant receives or has received to relieve the pain; and
(6)  the opinions and statements of the claimant's doctors.

*Id.* (*citing Felisky v. Bowen*, 35 F.3d 1027, 1039–40 (6th Cir. 1994).

The ALJ may discount a claimant's credibility where the ALJ finds contradictions among the

medical records, claimant's testimony, and other evidence.  *Id.* (*citing Walter v. Commissioner of*

*Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).  Since the ALJ has the opportunity to observe the

claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility as to pain

should be accorded great deference to that determination.  *Id.* (*See Casey v. Secretary of Health and*

*Human Services*, 987 F.2d 1230, 1234 (6th Cir.1993)).  Nevertheless, an ALJ's assessment of a

claimant's credibility as to pain must be supported by substantial evidence.  *Id.* (*citing Walters*, *supra*,

127 F.3d at 531).  As a general rule, the ALJ''s credibility finding must be reasonable and supported

by substantial evidence.  *Id.* (*citing Rogers v. Commissioner*, 486 F.3d 234, 249 (6th Cir. 2007)).

B.  APPLICATION OF THE LAW.

A review of the ALJ's decision in its entirety shows that he acknowledged the requirement

that he consider the factors in SSR 96-7p in assessing credibility (Docket No. 11, p. 21 of 764).  To

that end, the ALJ considered Plaintiff's impairments, his difficulty breathing, his testimony at the

hearing, statements made to medical consultants and the consistency between the statements and the medical evidence (Docket No. 11, pp. 21-24 of 764). There was minimal testimony or other evidence of significant activities of daily living but the ALJ explained that he considered the written disability report which incorporated a detailed analysis of Plaintiff's daily activities (Docket No. 11, pp. 21-22 of 764). The ALJ considered the medications for treatment of breathing difficulties, his use of the antibiotics, his refusal to use the CPAP machine and the need to avoid environmental factors that aggravate his breathing. The only documented side effect from use of his medication or modalities was that Plaintiff refused to use the CPAP machine (Docket No. 11, pp. 21, 22, 23, 24 of 764). The ALJ actually found Plaintiff partially credible to the extent that his impairments could result in the symptoms alleged. The ALJ discounted Plaintiff's credibility about the intensity and limiting effects of his impairments because the totality of the evidence strongly suggested that Plaintiff was capable of performing the work activities inherent in the ALJ's residual functional capacity findings.

The Magistrate finds that factors delineated in SSR 96-7p are adequately explained in the decision. The ALJ conducted an adequate credibility analysis and his conclusion is supported by substantial evidence.

### X. CONCLUSION

The Magistrate recommends that this Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.


/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   August 26, 2013

### XI.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.